JUSTICE RICE
delivered the Opinion of the Court.
¶1 Appellant City of Billings (City) appeals the order of the Thirteenth Judicial District Court, Yellowstone County, ordering that it release copies of investigative documents and disciplinary forms without redactions for information identifying five City employees. The five employees had been disciplined by the City for inappropriate computer usage on their work computers. The Billings Gazette *411 (Gazette) sought access to documents detailing the investigation into and punishment of the misconduct. The City disclosed some documents but refused to release the disciplinary corrective action forms, and redacted all information that could be used to identify the five employees or uninvolved third parties alleging that to do so would violate the employees’ right to privacy. The District Court ruled in favor of the Gazette and ordered that unredacted copies of all documents, including the corrective action forms, be provided to the newspaper. The City appealed, and obtained an order staying judgment through appeal as to the identifying information, but not as to the corrective action forms. We reverse.
¶2 We restate and consider the following issues:
¶3 1. Did the District Court err by ordering that identifying information for five City employees disciplined for accessing pornography on their government computers be released to the Gazette?
¶4 2. Did the District Court abuse its discretion by denying the Gazette’s request for attorney fees?
FACTUAL AND PROCEDURAL BACKGROUND
¶5 Between March and June of 2012, the City discovered five city employees (Employees) had possibly been using their respective public City computers to access adult and/or pornographic material on the Internet during work hours. The City conducted separate internal investigations into the Internet activity of each Employee. Upon conclusion of each investigation, the City issued a written corrective action determination to each Employee, setting forth a summary of the evidence gathered during the investigation and the disciplinary action being taken by the City as a result. Each of the Employees was suspended for five days without pay.
¶6 On August 24, 2012, the Gazette requested copies of “all written reprimands or records of other disciplinary actions affecting employees of the City Attorney s office between February 1, 2012 and August 24, 2012.” On August 28, 2012, the Gazette requested the City provide a list of all city employees who had been disciplined within the prior six months. On August 31, 2012, the Gazette requested “documentation of the séarches/filtering that indicated a pattern of attempts to access blocked sites in the cases involving the five city workers suspended for accessing (or attempting to access) inappropriate websites[;] any reports by [the City’s Chief Information Office] regarding such searches; any communications between city employees... [and] any due process letters resulting from these incidents.” The City denied the first two requests, citing the employees’ privacy rights but, in response *412 to the third request, provided copies of its investigative documents relating to the Internet activity of the Employees and email correspondence sent in connection with the City’s internal investigation of the Employees. These documents were redacted to omit the names and other identifying information of the Employees and uninvolved third persons. The City did not provide copies of the disciplinary corrective action forms for any of the Employees.
¶7 The Gazette filed a Petition for Declaratory Relief and Writ of Mandamus. The Gazette asserted the documentation compiled by the City during and as a result of the investigation into unauthorized computer usage by disciplined City employees was subject to release under the “right to know” provision of Article II, Section 9 of the Montana Constitution and § 2-6-102, MCA, and that any privacy interest the disciplined employees may have in the information being requested did not clearly exceed the public’s right to know. The Gazette also requested its attorney fees incurred in enforcing its constitutional rights, pursuant to §§2-3-221 and 27-8-313, MCA.
¶8 The City filed a Motion for in camera inspection of the demanded documents to determine whether the demands of privacy outweighed the public’s right to know under these circumstances. On December 5, 2012, following the inspection, the District Court entered its Order and Decision granting the Gazette’s petition for declaratory judgment but denying its request for attorney fees. The District Court ordered the City to turn over the corrective action forms and all other requested documents, with redactions only for identifying information concerning uninvolved third parties.
¶9 The City simultaneously filed this appeal and a motion before the District Court to stay the order pending appeal to prevent the issues from being rendered moot. The District Court granted the motion to stay with regard to redactions for names and identifying information of the Employees, but found that the Gazette was entitled to redacted copies of the corrective action forms. The District Court attached redacted copies of the corrective action forms to its order granting a stay.
STANDARD OF REVIEW
¶10 A district court’s interpretation of law is reviewed to determine whether the court’s interpretation of the law is correct. Jefferson Co. v. Mont. Stand., 2003 MT 304, ¶ 9, 318 Mont. 173, 79 P.3d 805. We review a district court’s findings of fact to determine whether they are clearly erroneous. In re M.A.L., 2006 MT 299, ¶ 17, 334 Mont. 436, 148 P.3d 606. We review a district court’s award or denial of attorney fees *413 for an abuse of discretion. A district court abuses its discretion when it acts arbitrarily without conscientious judgment or exceeds the bounds of reason. Disability Rights Mont. v. State, 2009 MT 100, ¶ 13, 350 Mont. 101, 207 P.3d 1092.
DISCUSSION
¶11 1. Did the District Court err by ordering that identifying information for five City employees disciplined for accessing pornography on their government computers be released to the Gazette ?
¶12 Montana’s right to privacy is established in Article II, Section 10 of the Montana Constitution:
Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.
¶13 Often at issue with this provision is the public right to know, also established in the Montana Constitution. Article II, Section 9 of the Montana Constitution provides:
Right to know. No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits. [Emphasis added.]
¶14 We have held that these competing interests must be balanced “in the context of the facts of each case, to determine whether the demands of individual privacy clearly exceed the merits of public disclosure. Under this standard, the right to know may outweigh the right of individual privacy, depending on the facts.” Missoulian v. Bd. of Regents of Higher Educ., 207 Mont. 513, 529, 675 P.2d 962, 971 (1984) (emphasis in original).
¶15 An examination of a request under the public right to know provision of the Montana Constitution requires a three-step process:
First, we consider whether the provision applies to the particular political subdivision against whom enforcement is sought. Second, we determine whether the documents in question are “documents of public bodies” subject to public inspection. Finally, if the first two requirements are satisfied, we decide whether a privacy interest is present, and if so, whether the demand of individual privacy clearly exceeds the merits of public disclosure.
Becky v. Butte-Silver Bow Sch. Dist. No. 1, 274 Mont. 131, 136, 906 P.2d 193, 196 (1995). No single rule or policy can be used to determine what information may be released upon public request because each request requires a fact specific, case-by-case analysis of the interests *414 at issue and a balancing of the demands of individual privacy and the merits of public disclosure. Havre Daily News v. Havre, 2006 MT 215, ¶ 17, 333 Mont. 331, 142 P.3d 864.
¶16 The City does not dispute that it is subject to Article II, Section 9 of the Montana Constitution. The City argues that the inquiry should end with the second prong of the test: whether the investigative records and corrective action forms at issue are “documents of public bodies.” Though not raised by the Gazette, mootness is a threshold issue the Court must resolve before the merits of the dispute can be decided. Havre Daily News, ¶ 31. “‘A matter is moot when, due to an event or happening, the issue has ceased to exist and no longer presents an actual controversy.’ ” Havre Daily News, ¶ 31 (quoting Shamrock Motors, Inc. v. Ford Motor Co., 1999 MT 21, ¶ 19, 293 Mont. 188, 974 P.2d 1150).
¶17 We decline to address the issue of whether the documents requested by the Gazette are public documents because all of the requested documents have already been disclosed. The investigative records were voluntarily released to the Gazette with only Employee and third-party names and identifying information redacted. Additionally, the corrective actions forms with redactions only for Employee identifying information (name, job title, and department) have been turned over to the Gazette. Though the corrective action forms were disclosed by the District Court in its order granting a stay, rather than by the City, the forms have nevertheless been disseminated and any further discussion as to whether these forms are considered public documents has been rendered moot. Thus the only remaining issue is whether the Employees had a reasonable expectation of privacy in their identifying information in relation to the internal disciplinary proceedings that outweighs the public’s right to know.
A. Constitutionally Protected Privacy Interest
¶18 To determine whether a person has a constitutionally protected privacy interest, we consider (1) whether the person has a subjective or actual expectation of privacy, and (2) whether society is willing to recognize that expectation as reasonable. Mont. Human Rights Div. v. Billings, 199 Mont. 434, 442, 649 P.2d 1283, 1287 (1982). Actual expectation of privacy is necessarily a question of fact that requires a determination of whether the individual whose privacy is at issue had notice of possible disclosure. Havre Daily News, ¶ 23; Disability Rights Mont., ¶ 22.
¶19 The District Court found “the Employees did expect the fact they were disciplined for having misused public computers and the specifics *415 regarding that misuse would be and remain private.” The Gazette counters that no actual expectation of privacy could exist here because the City’s Internet use policy for employees provides that ‘tu]sers using City-provided Internet accounts should not assume they are provided any degree of anonymity.” Additionally, the policy states that Tu]se of the Internet may be monitored by the City.”
¶20 The precise question is whether the Employees had an actual expectation of privacy in their identities in relation to internal disciplinary proceedings, not as to their employer’s knowledge of their Internet usage. Only the latter is addressed by the City’s policy. If the question was whether they held an actual expectation that the City would not monitor their usage, clearly the answer would be no. However, the City’s Internet usage policy alone is insufficient to render clearly erroneous the District Court’s finding that the Employees had an actual expectation that “the fact they were disciplined for having misused public computers ... would be and remain private.”
¶21 Having concluded the Employees had an actual or subjective expectation of privacy, we next must determine whether society would be willing to recognize that expectation as reasonable. Whether society is willing to accept an expectation of privacy as reasonable is a determination of law that requires
reasoned consideration of the specific facts underlying the dispute. To provide but a few examples, the following inquiries may prove relevant in evaluating the reasonableness of an individual’s expectation of privacy: (1) attributes of the individual ... and whether the individual holds a position of public trust; (2) the particular characteristics of the discrete piece of information; and (3) the relationship of that information to the public duties of the individual.
Havre Daily News, ¶ 23 (citations omitted). The reasonableness of an expectation of privacy “may vary, even regarding the same information and the same recipient of that information.” Mont. Human Rights Div., 199 Mont. at 443, 649 P.2d at 1288.
¶22 In order to examine this fact specific question of law, it is important to undertake a review of our prior decisions relating to the reasonableness of public employees’ expectations of privacy when balanced against the public’s right to know.
¶23 In Montana Human Rights Division, the Human Rights Commission (HRC) requested personnel records of complainants and certain other employees in order to investigate allegations of discrimination based on sex, race, marital status, and/or union membership. 199 Mont. at 436, 649 P.2d at 1284-85. The City refused *416 to release non-complainant files, citing those individuals’ right to privacy. Mont. Human Rights Div., 199 Mont. at 437, 649 P.2d at 1285. We noted that employment records reasonably contain references to family, health, or substance abuse problems, employer criticisms, test scores, prison or military records, and many other things an employee would reasonably expect to be confidential. Mont. Human Rights Div., 199 Mont. at 442, 649 P.2d at 1287-88.
¶24 We ultimately held that, though the information being requested was subject to the right to privacy, the right was nevertheless outweighed by other considerations, including the right to equal protection and the HRC’s authority to investigate claims of discrimination. Mont. Human Rights Div., 199 Mont. at 442-44, 649 P.2d at 1287-89. We rejected the City s argument that redaction of the names could reduce the intrusion on the non-complainants’ privacy because the names alone could be indicators of sex, race, or even marital status, information which may not be available in the rest of the file. Mont. Human Rights Div., 199 Mont. at 446, 649 P.2d at 1289. Though we found that the right to privacy was outweighed by the HRC’s right to know, we required a protection order to restrict release of identifying information to the public. Mont. Human Rights Div., 199 Mont. at 449, 649 P.2d at 1291.
¶25 Two years later, in Missoulian, we held that the individual privacy interests of six university presidents in confidential job performance evaluations clearly exceeded the merits of public disclosure. 207 Mont. at 533, 675 P.2d at 973. The Missoulian had sought access to a meeting of the Board of Regents (Board) and the Commissioner of Higher Education (Commissioner) where the presidents’ job performance was discussed, as well as evaluation documents considered by the Board. Missoulian, 207 Mont. at 517, 675 P.2d at 964-65. The request was denied by the Board due to privacy concerns. Missoulian, 207 Mont. at 517, 675 P.2d at 964-65.
¶26 We held that “time, place and status are factors in the reasonableness determination.... [T]he determination should include consideration of all relevant circumstances, including the nature of the information sought.” Missoulian, 207 Mont. at 523, 675 P.2d at 968 (emphasis in original). “[M]ere status does not control the determination. University presidents do not waive their constitutional protections by taking office.” Missoulian, 207 Mont. at 526, 675 P.2d at 969. Confidentiality in personnel records and evaluations is especially important because such records include subjective opinions of the employee’s performance that will vary with the person evaluating the employee, public disclosure could impede candid *417 communication between employer and employee, and a supervisor could use the public nature of evaluations or ratings as a vindictive mechanism against employees she disliked. Missoulian, 207 Mont. at 527, 675 P.2d at 970 (citing Trenton Times Corp. v. Bd. of Educ., 351 A.2d 30, 33 (N.J. Super. App. Div., 1976)). We found it reasonable to expect that information that has a “ Tack of objective criteria, the potential for vindictiveness, the lack of an opportunity for the employee to rebut statements... and a substantial potential for abuse’ ” will be kept confidential. Missoulian, 207 Mont. at 527, 675 P.2d at 970 (quoting Trenton Times, 351 A.2d at 33). We concluded the presidents’ right to privacy clearly outweighed general assertions that public disclosure would “foster[ ] public confidence in public institutions, maintain[ ] the accountability of public officials, assur[e] public access to information to allow evaluation of public expenditures, and prevent[ ] the secret conduct of government and usurping of the people’s sovereignty,” without a showing of how any of these interests would be furthered or hindered by public disclosure. Missoulian, 207 Mont. at 532, 675 P.2d at 972.
¶27 In Great Falls Tribune v. Cascade County Sheriff, 238 Mont. 103, 107, 775 P.2d 1267, 1269 (1989), we held that the privacy interests in the identity of law enforcement officers disciplined for unlawful acts while on duty did not clearly exceed the merits of public disclosure. City police officers and county sheriffs deputies were involved in a chase to apprehend a suspect. Great Falls Tribune, 238 Mont. at 104, 775 P.2d at 1267. A deputy sheriff ran his car up onto a city sidewalk and struck the suspect, then on foot, but did not take him for medical treatment. Great Falls Tribune, 238 Mont. at 104, 775 P.2d at 1267. An investigation into the suspect’s injuries resulted in one deputy being suspended, one police officer being fired, and two other police officers resigning when given the option to resign or be discharged. Great Falls Tribune, 238 Mont. at 104, 775 P.2d at 1267. The Great Falls Tribune sought the names of the disciplined officers. Great Falls Tribune, 238 Mont. at 104, 775 P.2d at 1268.
¶28 We affirmed the District Court’s conclusion that society would not recognize a very strong expectation of privacy in the identity of law enforcement officers disciplined for serious misconduct while in the line of duty. Great Falls Tribune, 238 Mont. at 107, 775 P.2d at 1269. Law enforcement officers occupy positions of public trust because the “public health, safety, and welfare are closely tied to an honest police force. The conduct of our law enforcement officers is a sensitive matter so that if they engage in conduct resulting in discipline for misconduct in the line of duty, the public should know.” Great Falls Tribune, 238 *418 Mont. at 107, 775 P.2d at 1269.
¶29 In Flesh v. Board of Trustees of Joint School Dist. No. 2, 241 Mont. 158, 166, 786 P.2d 4, 9 (1990), we concluded that an assistant school administrator had a reasonable expectation of privacy in a meeting to discuss allegations of wrongdoing that outweighed the public’s right to know. Robert Flesh (Flesh) filed a complaint to void any decision made during the closed portion of a meeting where the school board heard a grievance filed by Flesh alleging that the assistant school administrator had maliciously made false statements against him. Flesh, 241 Mont. at 160, 786 P.2d at 6. Over Flesh’s objections, the school board closed the presentation and deliberation portions of the meeting to the public. Flesh, 241 Mont. at 161, 786 P.2d at 6.
¶30 We noted that the grievance specifically asked the school board to take disciplinary action against the administrator, a request that would necessitate a review of his personnel record. Flesh, 241 Mont. at 166, 786 P.2d at 9. We held that “society is willing to recognize a privacy interest in a public employer’s consideration of allegations involving an employee’s character, integrity, honesty, and personality.” Flesh, 241 Mont. at 165, 786 P.2d at 9. Since there was no showing of any public interest to be served by opening the meeting to the public, the privacy interest of the employee clearly outweighed the public’s right to know. Flesh, 241 Mont. at 166, 786 P.2d at 9.
¶31 In Citizens to Recall Mayor Whitlock v. Whitlock, 255 Mont. 517, 522-23, 844 P.2d 74, 77-78 (1992), we held that a mayor, as an elected official, has no reasonable expectation of privacy in regard to an investigation of allegations of “sexually harassing public employees or of other misconduct related to the performance of his official duties.” Then-Mayor James Whitlock of Hamilton had been accused by City Judge Martha Bethel of sexual harassment and discrimination. A citizens group filed suit seeking release of the investigatory report. Whitlock, 255 Mont. at 519-20, 844 P.2d at 76.
¶32 In affirming the District Court’s order to release the report, we noted two important reasons that the mayor could not allege a reasonable expectation of privacy. Whitlock, 255 Mont. at 522-23, 844 P.2d at 77-78. First, an elected official must be subjected to public scrutiny because it is the public that has the responsibility for ‘hiring, disciplinary action, and supervision.” Whitlock, 255 Mont. at 522, 844 P.2d at 77. Second, we noted that the nature of the information being sought was the result of an investigation into misconduct related to the performance of his official duties, rather than general performance evaluations or discussion of Whitlock’s character, integrity, honesty, or personality. Whitlock, 255 Mont. at 523, 844 P.2d at 78. We held *419 that sexual harassment allegations went directly to Whitlock’s ability to properly carry out his public duties, and the report was therefore properly disclosed. Whitlock, 255 Mont. at 522, 844 P.2d at 77-78.
¶33 In Bozeman Daily Chronicle v. Bozeman Police Department, 260 Mont. 218, 220, 859 P.2d 435, 436 (1993), a cadet at the Law Enforcement Academy in Bozeman made an allegation of sexual intercourse without consent against an off-duty Bozeman city police officer. Following investigation, no criminal charges were filed, but the special prosecutor opined that “[the police officer] should not be allowed to continue working as a law enforcement officer because of inappropriate use of his position in relation to his contacts with women.” Bozeman Daily Chronicle, 260 Mont. at 220, 859 P.2d at 436-37. The officer resigned the next day. Bozeman Daily Chronicle, 260 Mont. at 220, 859 P.2d at 437. The Bozeman Daily Chronicle (Chronicle) sought the name of the officer and the investigative documents. Bozeman Daily Chronicle, 260 Mont. at 221, 859 P.2d at 437.
¶34 We upheld the District Court’s order to release the name, and reversed its order shielding the investigative documents. Bozeman Daily Chronicle, 260 Mont. at 221, 229, 859 P.2d at 437, 442. Though the officer had been off duty at the time of the alleged misconduct, and had resigned by the time of the Chronicle’s request, we noted that ‘the nature of the alleged misconduct ran directly counter to the police officer’s sworn duty to uphold the law, to prevent crime, and to protect the public.... [S]uch alleged misconduct went directly to the police officer’s breach of his position of public trust [and] therefore, this conduct is a proper matter for public scrutiny.” Bozeman Daily Chronicle, 260 Mont. at 227, 859 P.2d at 440.
¶35 In Jefferson County, ¶¶ 4-5, the Montana Standard sought information regarding the arrest for DUI of Beaverhead County Commissioner Donna Sevalstad (Sevalstad). Sevalstad pled guilty to driving under the influence of alcohol and driving with an expired license. Jefferson Co., ¶ 4. We cited our decision in Whitlock in affirming the District Court’s order to release the requested information. Jefferson Co., ¶ 16. Because Sevalstad was an elected official, the public had the responsibility in hiring, supervising and disciplining her actions, which requires that the public be informed of her actions and conduct. Jefferson Co., ¶¶ 16-17 (citing Whitlock, 255 Mont. at 522, 844 P.2d at 77). Even though her driving habits didn’t pertain directly to her duties as County Commissioner, ‘her decision to violate the law directly relate[d] to her ability to effectively perform her job duties. That is, Sevalstad’s decision to violate the law questions *420 her judgment.” Jefferson Co., ¶ 17.
¶36 We have also held that teachers hold positions of public trust because they are entrusted with the care and instruction of children. Svaldi v. Anaconda-Deer Lodge Co., 2005 MT 17, ¶ 31, 325 Mont. 365, 106 P.3d 548. Antoinette Svaldi (Svaldi), a teacher in the Anaconda public school system for approximately 25 years, was alleged by several parents to have assaulted or verbally abused their children. Svaldi, ¶ 5. Svaldi filed an action against the County alleging that her right to privacy was violated when the County Attorney informed a reporter from a local paper that his office was discussing a deferred prosecution agreement with Svaldi’s attorney in exchange for Svaldi’s promise to resign from teaching. Svaldi, ¶¶ 10-11. We affirmed the District Court’s grant of summary judgment in favor of the County, even though no criminal charges were ultimately filed and no deferred prosecution agreement was ever entered, because she was in a position of public trust and the allegations of assault against her students “went directly to her ability to properly carry out her duties.” Svaldi, ¶ 31.
¶37 In Yellowstone County v. Billings Gazette, 2006 MT 218, ¶¶ 22-23, 333 Mont. 390, 143 P.3d 135, we held that an interim chief public defender did not have a reasonable expectation of privacy in his deposition testimony for an employment discrimination lawsuit that outweighed the public right to know. Following the resignation of the Yellowstone County Chief Public Defender, Curtis Bevolden (Bevolden) was hired as the interim chief. Yellowstone Co., ¶ 4. Bevolden fired the Deputy Chief Defender, Roberta Drew (Drew), who had also applied for the interim chief position, but an internal grievance proceeding resulted in Drew’s reinstatement. Yellowstone Co., ¶ 4. Drew filed a federal discrimination suit against the County, Bevolden, and other officials. Yellowstone Co., ¶ 4. The Gazette requested Bevolden’s unredacted deposition transcript from the suit. Yellowstone Co., ¶ 7.
¶38 In holding that the public right to know was not clearly outweighed by any privacy interest Bevolden may have in the redacted information, we noted that public defenders have the duty to safeguard the constitutional rights to counsel and a fair and speedy trial, and are essential to preserving public trust in our judicial system. Yellowstone Co., ¶ 22. We also held that the redacted information of the transcript “bears directly on Bevolden’s professional judgment, the management decisions he made as Interim Chief Public Defender, and his official conduct.” Yellowstone Co., ¶ 23. Because the information being sought related directly to the official duties of a person in a position of public *421 trust, Bevolden could not assert a right to privacy that outweighed the public’s right to know.
¶39 In 2011, we decided Billings Gazette v. Billings, 2011 MT 293, 362 Mont. 522, 267 P.3d 11. Deanna Anthony (Anthony), a Police Department Senior Administrative Coordinator authorized to use a police department credit card, was investigated for allegations that she had made thousands of dollars of personal purchases using the card. Billings Gazette, ¶¶ 3, 25. Following the investigation, Anthony was issued a 16-page “due process letter” notifying her of a due process hearing to respond to the allegations against her, and detailing the evidence gathered during the investigation. Billings Gazette, ¶ 4. The City denied the Gazette’s request for the letter. Billings Gazette, ¶ 5.
¶40 We held that even though she was an administrative employee, Anthony held a position of public trust because she was in a job that “allowed her to spend large amounts of public monies.” Billings Gazette, ¶ 22. Because the information being sought related directly to an investigation for allegations of misappropriating public funds, “the very aspect of her job that render[ed] it a ‘position of public trust,’ ’’the due process letter was properly subject to public disclosure. Billings Gazette, ¶ 22. However, we also pointed out that not “every public employee with purchasing power can have no expectation of privacy in her personnel matters.” Billings Gazette, ¶ 27. Based on the facts of the case (“the alleged embezzlement of large sums of [public] money over a protracted period of time”), we held that information relating to a public employee’s violation of the public trust implicit in her duties should be released to the public. Billings Gazette, ¶ 27.
¶41 Having reviewed our prior cases, we turn to the case at bar. The information at issue in this case is limited to the identity of the Employees, including identifying information such as job title and department, as all other aspects of the misconduct, including the nature of the misconduct, the websites visited, the investigation process, and the discipline issued, has been disclosed to the Gazette. Initially, we note that the specific allegations of misconduct, accessing adult or pornographic websites, are not a focus of this analysis. We have held that a public employee is not entitled to heightened privacy protections simply because the information at issue was sexual in nature. Harris v. Smartt, 2002 MT 239, ¶ 66, 311 Mont. 507, 57 P.3d 58 (Justice of the Peace not entitled to heightened privacy rights in pornography downloaded to his county-owned computer). However, neither is a public employee given less of a privacy right due to the sexual nature of the information. The fact that the images viewed on the Employees’ computers ‘had sexual content does not influence the *422 privacy analysis.” Harris, ¶ 67.
¶42 The City averred that the Employees were not elected officials, department heads, or high management. After in-camera review of the unredacted Corrective Action Forms, the District Court did not make any finding that any of the Employees hold any particular position of trust with regard to public spending or public safety. Our review of the unredacted forms does not convince us otherwise. Additionally, the Internet usage of the Employees was not related to their public duties. The Gazette has not argued to this Court that disclosure of the Employees’ positions or titles, separate and distinct from the Employees’ names, was necessary in order to analyze their respective expectations of privacy.
¶43 Rather, the Gazette argues that there can be no reasonable expectation of privacy in the identity of any public employee if the employee was disciplined for misconduct. The Gazette argues that this holding follows from our decision in Great Falls Tribune where we stated: fit is not good public policy to recognize an expectation of privacy in protecting the identity of a law enforcement officer whose conduct is sufficiently reprehensible to merit discipline.” Great Falls Tribune, 238 Mont. at 107, 775 P.2d at 1269. We reiterated this in Bozeman Daily Chronicle, 260 Mont. at 225, 859 P.2d at 439. However, there are key distinctions between those cases and this one.
¶44 First, in both prior cases the discipline was severe. See Great Falls Tribune, 238 Mont. at 104, 775 P.2d at 1267 (one officer was fired and two others were given the option to resign or be terminated); Bozeman Daily Chronicle, 260 Mont. at 220, 859 P.2d at 436-37 (officer resigned after it was recommended that he not be allowed to continue in law enforcement). Here the employees were given a five-day suspension without pay, a far cry from being discharged or forced to resign. If we were to give the statement from Great Falls Tribune the meaning urged by the Gazette, any disciplinary action, no matter how trivial, would trump an employee’s right to privacy.
¶45 Other important distinctions in the case here are the positions held by the disciplined Employees and the relation of their positions to the alleged misconduct. In Great Falls Tribune, the employees whose identities were being sought were law enforcement officers who had engaged in misconduct in the line of their official duties. We held that law enforcement officers hold a particular position of public trust due to their sworn duty to protect the public health, safety, and welfare. Great Falls Tribune, 238 Mont. at 107, 775 P.2d at 1269. Allegations of misconduct in apprehending a suspect and failing to seek medical attention for his injuries clearly violate this duty. *423 Similarly, in Bozeman Daily Chronicle, we noted that allegations of criminal conduct, even while off duty, ran directly counter to the officer’s duty to uphold the law and prevent crime. Bozeman Daily Chronicle, 260 Mont. at 227, 859 P.2d at 440. Also, the officer’s position was implicated by the victim’s status as a police cadet. No similar connection can be made with regard to the Employees in this case.
¶46 The Dissent argues that the Employees’ actions could be considered illegal conduct under the Computer Fraud and Abuse Act, as well as Montana’s Unlawful Computer Use, Theft, and Official Misconduct statutes. Dissent, ¶ 68. However, no criminal charges have been filed or are contemplated in this case. Notably, the Ninth U.S. Circuit Court of Appeals has held that an employee’s misuse of an employer’s computer is not a crime under the Computer Fraud and Abuse Act. U.S. v. Nosal, 676 F.3d 854, 860 (9th Cir. 2012) (refusing to read the CFAA as policing employer personnel policies through criminal law). In any event, the misconduct in this case does not rise to the level of illegal conduct that was present in Great Falls Tribune, Bozeman Daily Chronicle, or Billings Gazette.
¶47 Additionally, we have previously held that matters relating to employee misconduct can be protected from the public right to know. In Montana Human Rights Division, we held that public employees possess a privacy right in their personnel files. 199 Mont. at 443, 649 P.2d at 1288. The Court noted that personnel files can include sensitive information such as drug and alcohol problems, prison records, poor work performance, and tardiness-all forms of wrongful conduct. Mont. Human Rights Div., 199 Mont at 442, 649 P.2d at 1288. “A discussion regarding an employee’s alleged wrongful conduct constituted precisely the type of communication that frequently occurred between the employer and employee.” Billings Gazette, ¶ 48 (Morris, Rice, Baker, JJ., dissenting) (citing Mont. Human Rights Div., 199 Mont at 442, 649 P.2d at 1288). The Court in Montana Human Rights Division recognized the fact that there is frequently pressure upon an employee to “communicate these matters to his employer in the privacy of his boss’s office ....’’Mont. Human Rights Div., 199 Mont at 442, 649 P.2d at 1288. Even without any assurance of confidentiality, the Court nevertheless concluded that “employees would reasonably expect such communication normally would be kept confidential.” Mont. Human Rights Div., 199 Mont at 442, 649 P.2d at 1288. Thus, an allegation of misconduct by a public employee does not summarily end the privacy analysis.
¶48 The Gazette also argues, and the District Court agreed, that the City’s Acceptable Use Policy demonstrates that the public placed its *424 trust in the Employees with respect to Internet usage. It further argues that misuse of the Internet, a City resource, while at work is a violation of that public trust that relates directly to their fitness to perform a public duty. However, evident from the above discussion of our cases, not all public employees hold the same level of privacy in all disciplinary matters simply on the basis of having a public employer. We are not prepared to say that providing public employees with access to a computer on which to do their work itself “evinces a public trust” that can be breached by a violation of an Internet use policy. Nor are we prepared to hold that any violation of office policy by any government employee results in a violation of public trust simply because tax dollars pay that employee’s salary. To do so would be tantamount to a holding that all citizens lose their constitutionally guaranteed right to privacy on the day they enter public employment. If university presidents do not automatically lose their constitutional protections by taking office, Missoulian, 207 Mont. at 526, 675 P.2d at 969, the same would certainly be true for the thousands of other public employees.
¶49 Our past cases have held, and we reaffirm today, that the “ ‘right of privacy turns on the reasonableness of the expectation, which may vary, even regarding the same information and the same recipient of that information’... [T]ime, place and status are factors in the reasonableness determination.”Missoulian, 207 Mont. at 523, 675 P.2d at 968 (quoting Montana Human Rights Div., 199 Mont. at 443, 649 P.2d at 1288). Where the status of the employee necessitates a high level of public trust, such as an elected official or high level employee, the expectation of privacy in misconduct may be found to be significantly lower than for an administrative employee. Similarly, an employee may have a lower expectation of privacy in misconduct related to a duty of public trust, such as responsibility for spending public money or educating children.
¶50 Here, the Employees are not elected officials, high-level management, or department heads, nor is there evidence that any specific duty alleged to have been violated related to the performance of a public trust function. The information being sought is merely their identities in relation to internal disciplinary action for a violation of office policy. We hold that society would be willing to accept as reasonable a public employee’s expectation of privacy in his or her identity with respect to internal disciplinary matters when that employee is not in a position of public trust, and the misconduct resulting in the discipline was not a violation of a duty requiring a high level of public trust.
*425 ¶51 The Dissent employs a Fourth Amendment analysis and concludes that the Employees had no reasonable expectation of privacy in their computer misuse. Dissent, ¶¶ 74,75. The Fourth Amendment protects persons from unreasonable searches and seizures in the criminal context. The misconduct in this case involved no criminal conduct. Further, the civil cases cited by the Dissent, including the extensive quote from Muick v. Glenarye Electronics, 280 F.3d 741 (7th Cir. 2002), involve employee privacy claims raised against employers who sought information. Rejection of such claims by the courts in these cases was appropriately premised upon the employees’ lack of an expectation of privacy as to their employers. Unlike these cases, there is here no privacy claim by the Employees against the City. The City obtained the information from the Employees’ computers pursuant to the computer use policy, and proceeded to discipline the Employees. The question is whether the Gazette-a third party4s entitled to the identifying information about the Employees.
¶52 Montanans are provided a ‘heightened expectation of privacy” under the Montana Constitution in comparison to the U.S. Constitution, State v. 1993 Chevrolet Pickup, 2005 MT 180, ¶ 9, 328 Mont. 10, 116 P.3d 800, and Article II, Sections 9 and 10 of the Montana Constitution explicitly require that a balancing of the right to know and the right to privacy be conducted in this case. This Court’s precedent provides the appropriate analysis of the particular state constitutional provisions that govern here, without regard to Fourth Amendment jurisprudence or federal approaches to the issue.
¶53 Having found that the Employees had an actual or subjective expectation of privacy that society is willing to find reasonable, we must balance the Employees’ right to privacy against the merits of public disclosure.
B. Balancing Privacy with the Public Right to Know
¶54 The City argues that the risks mentioned in Missoulian with respect to performance evaluations are present in this case and necessitate a need for confidentiality in internal disciplinary matters. Specifically, it asserts that it has an interest in the confidentiality of disciplinary measures in order to effectively address and react to misconduct without fear that employer criticisms and disciplinary actions will be publicly disseminated. It argues that honest and critical communications between employers and employees will suffer, and there could be a risk of vindictive use of the discipline process, which lacks an opportunity for the employee to rebut the alleged misconduct, if disciplinary actions are subjected to public scrutiny.
¶55 The only argument offered by the Gazette in favor of public *426 disclosure is that To]penness promotes fairness and thwarts cronyism.’Tt argues that without knowing the name and status of each disciplined Employee, the public cannot determine why each Employee was given the same punishment, or why an employee of a different public agency was given a harsher punishment for similar conduct. The District Court agreed, holding that public disclosure of the corrective action forms and identifying information would ‘foster[ ] a public confidence in public institutions and maintain[ ] the accountability of public officers.”
¶56 However, as we held in Missoulian, general assertions that public disclosure will foster public confidence in public institutions and maintain accountability for public officers are not sufficient to establish a strong public interest. Missoulian, 207 Mont. at 532, 675 P.2d at 972. The Gazette has already received information regarding the misconduct of the Employees, the investigation by the City, and the discipline meted out to each Employee. If the public is dissatisfied with the discipline chosen by the City, it has all the information it needs to voice its opinions and objections to the City Council, the Mayor, or the newspaper. Public knowledge of the names of the individuals disciplined will not provide the public with any greater opportunity to participate in the internal employment decisions of the City.
¶57 Unlike public officials, over whom the public has responsibilities regarding ‘hiring, disciplinary action, and supervision,” Whitlock, 255 Mont, at 522, 844 P.2d at 77, it is the responsibility of the City to hire, fire, and discipline its employees. Such decisions necessarily involve a subjective determination on the part of the supervisor. The nature of the work to be done, the alleged misconduct, and the person making the disciplinary decision will all affect the type of discipline meted out, even for the exact same violation. As we noted in Flesh, these disciplinary decisions necessitate a review of the employee’s entire personnel file. Flesh, 241 Mont. at 166, 786 P.2d at 9.
¶58 Finally, to hold that the general interests of ‘fairness and prevention of cronyism,” absent any allegations that such has occurred, is sufficient to outweigh an employee’s privacy interest would open all public employment decisions to public scrutiny. Decisions of whom to hire, promote, discipline, or terminate are all decisions that require a subjective evaluation by supervisors based upon past performance, personality, character, test scores, etc. Our past cases preclude such an expansive holding.
¶59 We conclude that the Employees’ reasonable expectation of privacy in their identities with regards to internal disciplinary *427 proceedings clearly outweighs the limited merits of public disclosure. ‘This information may make interesting or sensational news copy, but we conclude that public disclosure is not in the public interest.” Missoulian, 207 Mont. at 532, 675 P.2d at 972.
¶60 2. Did the District Court err by denying the Gazette’s request for attorney fees and costs?
¶61 Having concluded that the District Court’s order to disclose the Employees’ identities was entered in error, we decline to address the Gazette’s request for attorney fees.
CHIEF JUSTICE McGRATH, JUSTICES WHEAT, BAKER and MORRIS concur.